```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
UNITED STATES OF AMERICA

            -against-                    MEMORANDUM AND ORDER
                                         Case No. 11-CR-405 (FB) (S-7)
CHRISTIAN JOHN and MARVIN
JOHNSON,

                    Defendants.
-------------------------------------------------x
```

*Appearances:*
| | |
|---|---|
| *For the Government:* | *For Defendant Christian John:* |
| KELLY T. CURRIE | EPHRAIM SAVITT |
| Acting United States Attorney | NATASHA D. MAROSI |
| Eastern District of New York | 260 Madison Avenue, 22nd Floor |
| | New York, New York 10016 |
| by | |
| | *For Defendant Marvin Johnson:* |
| CELIA A. COHEN | JOHN F. KALEY |
| SOUMYA DAYANANDA | Doar Rieck & Mack |
| ROBERT T. POLEMENI | 217 Broadway, Suite 707 |
| Assistant United States Attorneys | New York, New York 10007 |
| | |
| | RICHARD JASPER |
| | YING STAFFORD |
| | 276 Fifth Avenue, Suite 501 |
| | New York, New York 10001 |

**BLOCK, Senior District Judge:**

After a 17-day jury trial, Christian John was convicted of racketeering; racketeering conspiracy; drug distribution conspiracy; robbery; robbery conspiracy; murder-for-hire conspiracy; charges relating to the murder of five individuals, the

attempted murder of a sixth and an assault on a seventh; and possession and use of a firearm in connection with various other crimes. His co-defendant, Marvin Johnson, was acquitted of the racketeering and racketeering conspiracy charges, but convicted of participation in the drug distribution conspiracy, robbery conspiracy, use of a firearm in connection with those conspiracies, and participation in one of the murders.

Both defendants now move for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29 and, in the alternative, new trials pursuant to Rule 33. For the following reasons, the motions are denied.

## I. John's Motions

### A. Judgment of Acquittal

"A Rule 29 motion should be granted only if the district court concludes there is 'no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)). The defendant "carries a heavy burden, and must show that when viewing the evidence in its totality, in a light most favorable to the government, and drawing all inferences in favor of the prosecution, no rational trier of fact could have found him guilty." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

John's challenge to the verdict centers on the alleged enterprise, the "Hull Street Crew." He argues that the government failed to prove (1) that the enterprise existed,

2

(2) that it engaged in a pattern of racketeering activity, or (3) that any of the murders and other violent crimes he was convicted of were committed to maintain or increase a position in it.[1]

**1. Existence of the Enterprise**

A RICO "enterprise" is " a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Its existence is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* Although an enterprise must have a structure, it need not be a "business-like

---

[1]In a supplemental letter brief, John makes two additional arguments. First, he argues that there was insufficient evidence that the conspiracy to rob marijuana dealers had an effect on interstate commerce. The stipulated testimony of a narcotics agent that marijuana grown in New York State is "seldom distributed in large quantities," and that "the majority of sour marijuana, as high price marijuana, is grown outside of New York," Trial Tr. at 2479, was sufficient to satisfy the government's minimal burden. *See United States v. Parkes*, 497 F.3d 220, 231 (2d Cir. 2007) (expert evidence that "very little marijuana is grown in New York" sufficient to support finding that robbery of drug dealer would affect interstate commerce).

Second, John argues that the Court failed to require the jury to unanimously agree which of four crimes supported its finding of guilt on the charge that he used a firearm in connection with a crime of violence or drug trafficking crime. Since, however, "the jury validly reached a unanimous guilty verdict on every predicate crime alleged, the erroneous jury instruction was necessarily harmless." *United States v. Gomez*, 580 F.3d 94, 104 (2d Cir. 2009).

entity" with a hierarchical chain-of-command or fixed roles for its members. *See Boyle v. United States*, 556 U.S. 938, 945, 948 (2009).

It is undisputed that the Court's jury instructions correctly defined "enterprise." There was, moreover, ample evidence to support the jury's conclusion that the "Hull Street Crew" fit that definition. Several witnesses testified that John recruited others and gave them orders to sell marijuana and cocaine. He also planned and directed others to assault and murder those whom he perceived as rivals or threats to his ventures. His confederates obeyed these orders. This structure persisted over a number of years.

John objects that the gang was nothing more than a collection of "independent street operators," John's Mem. of Law 17, most of whom had spent their lives engaged in criminal activity, and some of whom did not work with John until many years after the enterprise was allegedly created. He also notes that they committed crimes against each other as often as they worked together; for example, John was convicted of planning to murder Johnson and of beating up another alleged member of the enterprise, Michael Farmer.

John concedes, however, that the group "at times banded together in a common venture." *Id.* Neither independent side projects nor shifting loyalties are mutually exclusive with the existence of an enterprise. The Second Circuit has been clear that an enterprise "may continue to exist even though it undergoes changes in

4

membership," *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008), and that a "period of quiescence in an enterprises's course of conduct does not exempt the enterprise from RICO," *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010).

With regard to the enterprise's drug operations, John argues that there was no evidence of a common supplier or distribution network, "as would be expected of an enterprise." John's Mem. of Law 19. As noted, however, RICO's definition of "enterprise" extends beyond business entities. *See Boyle*, 556 U.S. at 945. While a drug-distribution enterprise might choose to mimic the operations of a business selling legal goods, it need not do so. Regardless of the means it chooses, it is a RICO enterprise as long as its members operate as a continuing unit and have a common purpose.

Finally, John argues that the cooperating witnesses who testified against him did not think of themselves as "racketeers" or members of an "enterprise," but as John's "brothers" and "friends." Close ties and friendships are not inconsistent with membership in an enterprise. After all, the enterprise that RICO was originally intended to combat was organized into five "families." *See, e.g.*, *United States v. Massino*, 546 F.3d 123, 126 (2d Cir. 2008). Moreover, it is hardly surprising that gang members do not define themselves in legal terms. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997) ("The phrase 'racketeering activity' is a term of art

5

defined in terms of activity that violates other laws[.]"). However they thought of themselves, they engaged in conduct evidencing an enterprise.

## 2. Pattern of Racketeering Activity

"According to the Supreme Court, criminal conduct forms a pattern of racketeering activity under RICO when it 'embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989). The Second Circuit has elaborated that the criminal acts constituting the pattern must be related both to each other ("horizontal" relatedness) and to the enterprise ("vertical" relatedness). *See United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992). Since, however, "[o]ne way to show that predicate acts are horizontally related to each other is to show that each predicate act is related to the RICO enterprise," *Daidone*, 471 F.3d at 375, "both the vertical and horizontal relationships are generally satisfied by linking each predicate act to the enterprise," *id.* at 376. This is done by showing that the defendant "was enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) that the predicate offenses are related to the activities of that enterprise." *Minicone*, 960 F.2d at 1106 (internal quotation marks and citation omitted).

6

Once again, there is no dispute that the Court's instructions correctly conveyed these concepts to the jury. John's argument is that the evidence failed to show a relationship between the enterprise and two of the predicate racketeering acts: the murder of Charlemagne Lormand (Racketeering Act One) and the robbery of Harstans Jewelers (Racketeering Act Six).

There was sufficient evidence for the jury to find that John killed Lormand at the behest of "Bird." Both John and Bird were members of the Bloods. Bird was selling crack on Chauncey Street, in direct competition with Lormand. Within a year of the murder, John was selling crack with Bird. From these facts, the jury could reasonably infer that John committed the murder as a means of establishing his own distribution enterprise and sending the message that he was able and willing to use violence to remove competitors.

John's enterprise also engaged in robberies, typically of other drug dealers. The robbery of a jewelry store in Connecticut was certainly unusual in that respect. Nevertheless, there was sufficient evidence to connect it to the enterprise. The idea for the robbery apparently came from John's "uncle," but John planned it. He assigned specific jobs to members of his crew, taking the role of getaway driver for himself. He distributed the proceeds, and a crew member's complaint about his share led to a shootout, providing John another opportunity to assert his authority over the enterprise.

7

## 3. Crimes in Aid of Racketeering

John does not deny that there was sufficient evidence to convict him of participating in the murders of five drug dealers. He argues, however, that there was insufficient evidence that he committed those crimes in aid of his enterprise.

A crime is committed in aid of racketeering if it is committed "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). That phrase, "accorded its ordinary meaning, appears to refer to a defendant who holds a position in a RICO enterprise and who committed an underlying crime of violence with a motive of retaining or enhancing that position." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). The motive element is satisfied "if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.*

Four of the five murders were committed in connection with plans to rob the victims of their drug supplies and/or proceeds, crimes that clearly benefitted the enterprise. It was not much of a stretch for the jury to infer that it would be expected of John, as head of the enterprise, to take violent steps to remove any impediment to the successful completion of those plans. The fifth—the murder of Daquane Shelton—was in retaliation for Shelton's having robbed John. Though John was no

8

doubt motivated by a desire for revenge, the jury could reasonably infer that he was also motivated, at least in part, by a desire to avoid losing prestige in the gang if the robber went unpunished. *See Concepcion*, 983 F.2d at 381 ("We reject any suggestion that the 'for the purpose of' element requires the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive.").

**B. New Trial**

Rule 33 authorizes a new trial "if the interest of justice so requires." This "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). However, "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting, with alteration, *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000).

John argues that a new trial is required on the non-RICO homicide counts (four counts of firearm-related murder and one court of drug-related murder) because of the "spillover prejudice" of the RICO counts. Since, for the reasons stated above, the Court is not granting a judgment of acquittal on the RICO counts, there is no basis for a new trial on the other counts. Moreover, "[a] defendant who claims that he is

9

entitled to a new trial because of prejudicial spillover bears an extremely heavy burden." *United States v. Villegas*, 899 F.2d 1324, 1347 (2d Cir. 1990). The evidence connecting the crimes to racketeering was, if anything, less inflammatory than the circumstances of the murders themselves, and the acquittal on one of the murder-in-aid-of-racketeering counts demonstrates that the jury was able to give each count separate consideration. *See United States v. Hamilton*, 334 F.3d 170, 184 (2d Cir. 2003) ("The absence of [prejudicial] spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others.").

## I. Johnson's Motions

### A. Judgment of Acquittal

Johnson challenges the sufficiency of the evidence supporting his convictions for murder in aid of racketeering and drug-related murder, as well as the sufficiency of the evidence of the quantity of crack cocaine for which he was responsible as a participant in the distribution conspiracy.

Taking the first challenge first, several witnesses testified that Johnson sold crack. In particular, Michael Farmer—who sold crack for Johnson for several months—testified that Johnson was able to unload about $1000 worth of crack every day or two. Given the stipulated street value of the drug, Johnson's $1000 worth of crack would translate to about twenty grams every "day or two," a quantity that would reach the 280-gram threshold after only two to four weeks.

Second, the evidence was sufficient to support the jury's conclusion that the murder of Kevin Obermuller was drug-related. A killing is drug-related if "(a) one motive for that killing was related to the drug conspiracy, or (b) [the defendant's] position in or control over the conspiracy facilitated the commission of the murder." *United States v. Aguilar*, 585 F.3d 652, 662 (2d Cir. 2009). Obermuller supplied Johnson with cocaine. Although the dispute the led to Obermuller's death apparently arose after he failed to pay for a vehicle he had purchased from Johnson, there was testimony that Johnson plotted to get what he felt Obermuller owed him by robbing him of his cocaine and drug proceeds.

Finally, the evidence was sufficient to support the conclusion that the murder was in aid of racketeering. As discussed in connection with John's motions, there was sufficient evidence that the Hull Street crew was an enterprise engaged in a pattern of racketeering activity. There was also sufficient evidence that Johnson was involved in the enterprise's drug-distribution and dog-fighting activities at the time of the murder, and the jury could reasonably infer that Johnson sought to solidify his membership in the organization by emulating the violent tactics of its leader.

## B. New Trial

As noted, Johnson was acquitted of racketeering and racketeering conspiracy. He argues that those acquittals are inconsistent with his conviction for murder in aid of racketeering.

The government responds that the verdicts are not necessarily inconsistent because each crime has an element that the other does not. *See United States v. Polanco*, 145 F.3d 536, 542 (2d Cir. 1998) ("[T]he government may prosecute a defendant both under RICO for engaging in a pattern of racketeering activity and also under § 1959 for violent crimes intended to maintain or increase the defendant's position in the RICO enterprise."). That may be conceptually true, but the government's theory was that Johnson was a member of John's gang. It is difficult to square a finding that Johnson killed Obermuller to maintain or enhance his position in that organization with a finding that he was not a member of it.

Nevertheless, an inconsistent verdict is not grounds for a new trial:

> Inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

*United States v. Powell*, 469 U.S. 57, 65 (1984). "The possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest." *Id.*

The possibility of jury lenity is certainly present in this case. The jury could have easily concluded that Johnson murdered Obermuller to enhance his position in the racketeering enterprise, but decided that he should not be held to the same level

of culpability as John for the enterprise's activities. This may mean that the jury misunderstood or ignored the Court's instruction that members of a racketeering enterprise are guilty of racketeering, even if they are not involved in all of the enterprise's activities or have not been members throughout its existence. But any such error inured to Johnson's benefit.

Johnson further argues that he was prejudiced by the evidence introduced on counts in which only John was charged. As with John's "spillover prejudice" argument, the fact that the jury acquitted Johnson on some counts demonstrates that it was able to consider each count and each defendant separately.

### III. Conclusion

John's and Johnson's post-trial motions are denied.

**SO ORDERED**.

/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 23, 2017